COLUMBUS, CHICAGO & INDIANA CENTRAL RAILWAY COMPANY

*v.*

NICHOLAS TROESCH.

|       |       |
|-------|-------|
| 57    | 155   |
| 93a   | ¹ 87  |

|        |       |
|--------|-------|
| 57     | 155   |
| 110a   | 106   |

NEW TRIAL—*verdict against the evidence.* In this case, the verdict of the jury being manifestly against the weight of the evidence, the judgment is for that reason reversed.

APPEAL from the Circuit Court of Cook county; the Hon. ERASTUS S. WILLIAMS, Judge, presiding.

The opinion states the case.

Mr. E. Walker, for the appellant.

Messrs. Hervey, Anthony & Galt, and Messrs. Merriam & Alexander, for the appellee.

Mr. Justice Sheldon delivered the opinion of the Court:

The declaration in this case alleged that, on the 20th day of September, 1868, the plaintiff, as conductor, had charge of a train of cars on the road of the defendant, in the city of Chicago ; that the defendant was at the time negligent of its duty in the use upon said train of an insufficient and unmanageable locomotive engine, unfit for use on said road, of which unfitness the defendant had notice, and of which the plaintiff was unaware, and that there was further negligence upon the part of the defendant, in the employment upon such train of a reckless and incompetent engineer, and that by reason of such negligence the plaintiff sustained great personal damage and injury.

The defendant pleaded the general issue. The case was tried before a jury, and a verdict rendered in favor of the plaintiff; a motion for a new trial was overruled and judgment rendered upon the verdict, and the cause was brought to this court by appeal.

The facts and circumstances which gave rise to the alleged cause of action are briefly as follows:

In the fall of 1867, the plaintiff entered the service of the defendant, as switchman, in the yards at Chicago. His particular duties under his employment were, to assist in the making up of trains, coupling and distributing cars. He was under the immediate control and subject to the orders of the yard-master. He continued this service a few months, when he received an injury which disabled him from labor for about four months, but returned to work in the same capacity in June, 1868, and continued until September 21, 1868.

A few days previous to the last named day, the plaintiff was promoted to switch conductor, and as such had control of

different trains in the yard, subject, however, to the orders of the yard-master. On the morning of September 21, 1868, the plaintiff took charge of a train, composed of flat cars, some eight or ten in number, loaded with railroad iron rails, under orders to proceed to Hoyne street, take on two more cars, and distribute or leave the cars elsewhere. Attached to this train was engine No. 34 (known as a switch engine,) under the control of Ransom Tupper as engineer, with James Casey as fireman; the plaintiff had, as an assistant or helper, Edward Bennett. The cars were all in front of, and being pushed by, the engine; the plaintiff standing upon the front end of the forward car, while Bennett was upon the engine with Tupper and Casey; there being no other persons upon the train. At Hoyne street it was necessary to bring the train to a full stop for the purpose of opening a switch, a fact known to both the plaintiff and Tupper. When at a distance of several car-lengths from Hoyne street, the plaintiff gave the engineer a signal, relative to the character of which there is contradictory evidence, but designed, at all events, to further reduce the rate of speed at which the train was moving, and in response to which Tupper reversed his engine. The effect of this reversal was to reduce, suddenly, the speed of the engine, and then to take up the slack or link with which the first car was attached to the engine, and thence from car to car until the last or forward car was reached, upon which the plaintiff was standing; also to produce a *jerking* of the cars, caused by the sudden reduction of speed. This threw the plaintiff off from and in front of the car, two or more cars passing over him, causing the injury complained of. Thus far in the statement of the circumstances of the case, the evidence of both parties concurs.

The question presented on this record is one of fact,—whether the verdict is sustained by the evidence.

As to the condition of the engine,—it appears in the fore part of 1868, to have been materially defective, and much out of repair; but about the 1st of June, it went into the machine shop for repairs, and remained there until about the middle of

August, and underwent what is called a "general overhauling," and came out thoroughly repaired and in good condition, and remained so until the time of the accident.    There was some evidence going to show that it was not in a good condition after being repaired, but we think the very decided preponderance of the testimony was to the contrary.

The testimony as to the bad character of Tupper, as engineer, was confined essentially to that of three witnesses, Crowther, Gamble and Wilson; and was to the effect that Tupper was habitually passionate and reckless, and in the habit of refusing to obey signals given him for the purpose of regulating the running of his engine.    It is a circumstance calculated to diminish the force of this testimony, that if the witnesses really deemed Tupper an unsafe engineer, they should have continued for so long a time to remain associated in service with him without complaint, as Gamble and Wilson did, as switchmen, with their lives and persons exposed to peril; and that Crowther, the yard-master, who had control of the switchman and engines engaged in and about the yard, should have kept, for nearly one year, Tupper and engine 34 at work in and about the yards, and without warning to the plaintiff or other employees. Crowther does testify, that he made complaint of Tupper to Burdell, the master mechanic, but Burdell positively denies it, or that he knew or heard anything as to the incompetency of Tupper.

Opposed to this, is the evidence of John Bennett, a witness called for the plaintiff, who had worked as switchman with Tupper; the defendant's witnesses, Milo Jacks, yard-master at the time, and who had known Tupper as engineer and fireman for five or six years; D. T. Harkness, division superintendent of the defendant's road at the time of the injury, with his office at Chicago; Amos Burdell, master mechanic of the defendant at Chicago, who promoted Tupper to the charge of the engine —but did not do so until he saw him for weeks in his immediate presence, and had an opportunity to become personally acquainted with his fitness for the place; George Merrian, his

assistant, and John Casey fireman upon engine 34, under Tupper.

It may be said, that Tupper was under the eye of these men for most of the time, and each of them testifies, that he never heard that Tupper was reckless or incompetent, and never saw anything that would indicate such imperfections of character.

Evidence was given as to three former accidents upon Tupper's train; but as to the one to the witness Wilson, he entirely exonerates the engineer. The accidents to Drake and Lowry were reported to Mr. Harkness, as superintendent, who examined the circumstances, and became satisfied that it was "their own fault"—that of Drake and Lowry.

We think there is a clear failure in the evidence, to show that the company did not exercise reasonable care, judgment and vigilance, in the selection and continuance in employment of this engineer.

It is to be remarked, that the essential complaint against the engineer is, that he was in the habit of getting into a passion, and of doing rash and reckless things when in that state; but in the present case, there had been no occurrence to provoke passion, and nothing appears to have been done under its influence.

What is complained of in this case as the wrongful act of the engineer, is, that in consequence of a certain signal given by the plaintiff, he reversed his engine, instead of " shutting off" steam.

Two signals are spoken of in the testimony, one, the raising both arms, indicating a reduction of speed, when steam should be "shut off;" the other, the raising of one arm, a request to "stop," to be effected by reversing the engine.

Both the plaintiff and Edward Bennett, his assistant, testified, that the signal was given with both arms, but Bishop, another witness for the plaintiff, who was a trackman in the employ of the North Western Railway company, at work repairing the track near the switch, and had stepped from the track and stood watching the approach of the train, testified that the signal was

given with one arm—with his statement Tupper, and Casey, the fireman, concur; both are positive that the signal was given with one arm.

The train in this case was controlled entirely by the engine; no breaks were used, it not being customary to use them on similar trains.   In approaching a stopping place, according to the testimony, the engineer must so reduce his speed as to be able to stop without violence to his train or engine, and this, either with or without signals from the conductor.   Tupper testified, that he knew he must stop his train before reaching Hoyne street, for the purpose of opening the switch; and on that account, as a proper means of reducing his speed, "shut off" his steam some ten or twelve car lengths from the switch. Casey testifies to his so shutting off steam, and no witness testified to the contrary; and they both testify, that afterwards, when about two car lengths from the switch, the signal was given. Now if the steam had been "shut off" when the signal was given, it was the duty of the engineer to "reverse," whether the signal was to "slow" or "stop."   The evidence is uncontradicted, that with the steam shut off, on receiving a signal to "slow," it would be the duty of the engineer to "reverse," as he could in no other way reduce the speed of his train.

The evidence is quite weak, as showing even any act of negligence, on the part of the engineer.   The appellee himself seems to have been negligent in occupying the position he did, at the time he was thrown from the train.   He was standing near the end of the platform car, upon the rails with which it was loaded, liable, upon a sudden reduction of speed, to be precipitated off the car; which seems to have been a place of unnecessary peril.   The proper place for a conductor to occupy, as testified to, is back far enough from the end of the car, to prevent any accident of being thrown off the car, from the jerking of the train.

Regarding the verdict in this case as being manifestly against the weight of the evidence, the judgment is reversed and the cause remanded.                     *Judgment reversed.*